**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CARMEN MEJIA and RAYMUNDO MORATAYA,**

                  **Plaintiffs,**

**-vs-**                                            **Case No. 6:09-cv-1348-Orl-31GJK**

**UNITED STATES OF AMERICA,**

                  **Defendant.**

_____

## MEMORANDUM OPINION AND ORDER

This is a medical malpractice case brought by Carmen Mejia ("Mejia") and Raymundo Morataya ("Morataya") as parents of their son ("JM") against the United States pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq*. A bench trial was held September 6-8, 2011, and the parties submitted post-trial memoranda (Doc. 92, 93), which the Court has considered.

**I.**     **The Issue**

During her pregnancy in 2007, Mejia became a patient of the Apopka Health Clinic ("AHC"), a federally funded healthcare provider. The AHC provided prenatal care,[1] and one of its doctors, Lawrence Decker ("Dr. Decker"), delivered the baby at Florida Hospital South ("FHS")[2]

---

[1] The quality of the prenatal care provided to Mejia is not an issue in this case. *See* Doc. 30.

[2] AHC uses the facilities and staff of FHS to deliver babies for the patients of AHC. Trial Transcript ("Tr.") Volume III, page 159.

on January 18, 2008.[3] During the delivery, a shoulder dystocia occurred,[4] which required Dr. Decker to employ emergency maneuvers to free the baby's shoulder. These maneuvers were ultimately successful. However, at some point during the delivery, JM suffered a brachial plexus[5] injury, affecting his right arm. Although subsequent surgery has somewhat alleviated the problem,[6] JM's injury is permanent in nature and future medical expenses are anticipated.[7] Plaintiffs claim that Dr. Decker was negligent during JM's delivery and that this negligence was the proximate cause of JM's injury. Defendant denies this claim.

## II. The Parties

### A. Plaintiffs

Raymundo Morataya and Carmen Mejia have a longstanding relationship but are not married. They have an 18-year-old son, Jonathan, who was delivered without complication.[8]

---

[3] Dr. Decker happened to be the AHC OB/GYN on duty that day.

[4] Shoulder dystocia occurs when the baby's shoulder is caught behind the mother's pubic bone, interrupting the delivery. It is an obstetrical emergency. If not resolved within minutes, it can result in the baby suffering a brain injury or death due to a lack of oxygen. Tr. II, p. 97; p. 118; Tr. III, p. 17; p. 157-p. 158.

[5] The brachial plexus is a group of nerves in the neck that exit the spinal cord, course through the shoulder, and provide the nerve supply to the upper extremity. Tr. I, p. 9-10.

[6] In connection with the injury, Plaintiffs have incurred expenses of approximately $132,000, although most of this amount has likely been paid by collateral sources. (Plaintiffs' Exh. 12-15).

[7] Both parties submitted cost estimates and an economic analysis of the present value of these anticipated expenses, ranging from $322,278 (Defendant) to $982,986 (Plaintiffs). Def. Exh. 15; Pl. Exh. 15. In addition, JM may require further surgery which the parties estimate will cost approximately $46,000 (Defendant) or $75,000 (Plaintiffs). In the Court's opinion, Plaintiffs' damages calculation is grossly inflated and entitled to little weight.

[8] Jonathan was a large baby, weighing 9 pounds, 13 ounces at birth. Tr. II, p. 279.

Morataya works at a bakery, and Mejia is unemployed. As neither Morataya nor Mejia speak English, a translator was used at trial.

In January 2008, Mejia was 32 years old, five feet tall and weighed 175 pounds. Except for gestational diabetes and obesity, she was in good health.[9]

B. Dr. Decker

Dr. Decker graduated from the Chicago College of Osteopathic Medicine in 1972 and completed his internship and residency at Walter Reed Army Hospital. Tr. III, p. 151-p. 152. He provided obstetric and gynecological services to servicewomen and military dependents as an Army officer between 1971 and 1979 and between 1986 and 2000, when he retired as a colonel. Tr. III, p. 151-p. 153. Dr. Decker provided the same services in private practice from 1979 until 2003. Tr. III, p. 153. In 2004, he began providing obstetrical and gynecological services as an employee of Community Health Care Centers, Inc. Tr. III, p. 150-p. 153.

Dr. Decker is board certified in obstetrics and gynecology by the American Board of Obstetrics and Gynecology. Tr. III, p. 153-p. 154. He stays informed on topics relevant to his practice area through journals and treatises published by the American Congress of Obstetricians and Gynecologists, of which he is a fellow, and through regular attendance at continuing education programs. Tr. III, p. 154-p. 156. The topic of shoulder dystocia is regularly addressed during these seminars. Tr. III, p. 156.

Dr. Decker estimates he has delivered between 5,000 and 7,000 babies in his career and previously encountered between 50 and 70 shoulder dystocias. Tr. III, p. 156-p. 157. Dr. Decker

---

[9]Obesity and diabetes are both risk factors for complications during child birth.

had experience and training in each of the maneuvers commonly employed by obstetricians to resolve a shoulder dystocia. Tr. III, p. 158-p. 159.

**III.    The Facts**

Mejia presented at FHS with Morataya on the morning of January 18, 2008. After initial screening, she was taken to a delivery room about 8:00 a.m., where she was attended by Nurse Haymen. Morataya stayed with her in the delivery room throughout the process.

Mejia's labor progressed smoothly with, in Dr. Decker's words, a "nice labor curve."[10] Tr. III, p. 167. Dr. Decker checked on Mejia periodically and monitored her progress. At approximately 10:45 a.m., he entered the delivery room to deliver the baby. Mejia was pushing with good progress, but when the baby's head appeared, a "turtle sign" was observed.[11] Tr. III, p. 171. Recognizing that a shoulder dystocia was occurring, Dr. Decker – with the assistance of Nurse Haymen – immediately began using recognized and appropriate maneuvers to relieve the obstruction. These maneuvers included the McRoberts maneuver, Wood's screw maneuver, and suprapubic pressure. After each maneuver, Dr. Decker applied in-line traction while Mejia pushed, to see if the maneuver had been successful. Tr. III, p. 171-172, 181. Finally, Dr. Decker tried what was referred to as a "posterior arm maneuver," which was successful. JM was delivered within a few minutes after the turtle sign first appeared. Tr. III, p. 173.

---

[10] Plaintiffs presented extensive evidence about signs of fetal distress on the fetal monitoring strips during delivery. The Court finds this evidence to be irrelevant to the brachial plexus injury involved int his case.

[11] "Turtle sign" refers to a situation in which the baby's head appears, but then recedes. T. III, p. 157.

**IV. Dueling Experts**

    A.    Dr. Berto Lopez

Plaintiffs presented Dr. Berto Lopez as their liability expert. Dr. Lopez is a physician specializing in obstetrics and gynecology. Tr. II, p. 93. Since 1987, he has delivered between 250 and 300 babies per year. He is a fellow in the American College of Obstetrics and Gynecology, has staff privileges at several hospitals and has been recognized as an expert in the field of obstetrics. The Court accepts Dr. Lopez as a Rule 702 expert witness in this field.[12]

In pertinent part, Dr. Lopez opines that Dr. Decker "failed to timely and appropriately treat a shoulder dystocia." Specifically, Dr. Lopez contends that Dr. Decker failed to use the appropriate maneuvers and applied excessive traction during the delivery, causing JM's brachial plexus injury. Plaintiffs' Exh. 18 at p.2.

With respect to the timeliness of the performance of the maneuvers, Dr. Lopez testified that a shoulder dystocia is an emergency situation that requires delivery within five to ten minutes. Tr. II, p. 236. With respect to the maneuvers utilized, Dr. Lopez was critical of employing the McRoberts maneuver with only one nurse rather than two, but admitted that the procedure can be effective in this situation. Tr. II, p. 237. As to the other procedures utilized in response to the shoulder dystocia, Dr. Lopez concedes that they were appropriate. However, he asserts that the use of traction to resolve a shoulder dystocia is inappropriate, Tr. II, p. 243, unless it is "gentle"

---

[12] The Court notes, however, that the great majority of Dr. Lopez's testimony has been on behalf of plaintiffs, including ten to twenty times on behalf of plaintiffs' counsel in this case. Tr. II, p. 209. The Court's primary concern with Dr. Lopez's testimony is the disturbing discovery that much of his report is identical to the expert report submitted by Plaintiffs' counsel for Nurse Mahlmeister, whom Plaintiffs' counsel sought to have testify as a nursing expert. Tr. II, p. 209-220.

traction. *Id.* Thus, in his opinion, gentle in-line traction *is* appropriate in connection with execution of the recognized maneuvers. But there is no scientific measure of the difference between gentle traction and excessive traction. Tr. II, p. 246.

In addition, Dr. Lopez criticized Dr. Decker for not discussing with Mejia the option of undergoing a Caesarean section.

B. Dr. Robert Gherman

Dr. Robert Gherman testified as Defendant's medical expert. Dr. Gherman is an OB/GYN with a subspecialty in maternal fetal medicine Tr. III, p. 5. He has practiced medicine since 1991 and is board certified by the American Board of Obstetrics and Gynecology. In addition to his medical practice, he has published scholarly articles dealing with shoulder dystocia (Tr. III, p. 8) and has testified as an OB/GYN in numerous cases.[13] The Court recognizes Dr. Gherman as a Rule 702 expert in the field of obstetrics. Tr. III, p. 15.

Dr. Gherman opined that Dr. Decker handled the shoulder dystocia with appropriate and well-recognized maneuvers; and did so in a thoughtful and logical process. Tr. III, p. 16. As was the case with Dr. Lopez, Dr. Gherman testified that a shoulder dystocia is a medical emergency and needs to be dealt with quickly, using the resources available. For example, he agreed with Dr. Lopez that when using the McRoberts maneuver,[14] it is preferable to have two people, but noted that it can be successfully performed with one. In his words, "time is of the essence in the handling of this obstetric emergency. So one is not going to wait and you're going to proceed with

---

[13] Approximately 70 percent of those cases have been on behalf of defendants. Tr. III, p. 50.

[14] According to a study published by Dr. Gherman, the McRoberts maneuver is successful in relieving a shoulder dystocia in 42 percent of cases. Tr. III, p. 16.

the individuals that you have present." Tr. III, p. 19. Dr. Gherman saw no evidence that Dr. Decker acted in an untimely manner. Defendant's Exh. 11 at 5. Indeed, the records disclose that the shoulder dystocia was relieved in approximately two minutes.

With respect to the use of traction, Dr. Gherman observed that traction is an inherent part of every delivery, that the maneuvers themselves are simply designed to free the shoulder – they do not deliver the child. In order to complete the delivery, one has to use traction and maternal expulsive efforts (i.e., pushing). Tr. III, p. 19. Two factors are at play: the direction of the force and the amount. As to direction, Dr. Gherman opined that it was significant that Decker correctly used *in-line* traction as opposed to lateral traction. Tr. III, p. 24. And, according to Dr. Gherman, he saw no basis to conclude that *excessive* traction was used.[15]

Finally, Dr. Gherman opined that a Caesarean section was not indicated under these circumstances. Tr. III, p. 36-39. According to his testimony, a shoulder dystocia occurs in less than two percent of all deliveries and is not clinically predictable. Therefore, the mere possibility of a shoulder dystocia does not warrant the significant additional risks and costs associated with a Caesarean section.

---

[15] The mere fact that such an injury occurs is not evidence of negligence. According to Dr. Gherman's published survey of two years' worth of deliveries in Los Angeles County, approximately one half of all brachial plexus injuries occur with normal labor. Tr. III, p. 26-28.

## V. Findings and Discussion

The *material* facts of this case are not in dispute.[16] Mejia's delivery of JM was interrupted by a shoulder dystocia. Seeing a turtle sign, Dr. Decker, with Nurse Haymen's assistance, immediately began employing standard maneuvers to relieve the obstruction. After each maneuver, Dr. Decker properly applied in-line traction to determine whether the maneuver had been successful. Tr. III, p. 191. Ultimately, his efforts were successful, and JM was delivered less

---

[16] Plaintiffs' counsel wasted much of the Court's time by presenting evidence related to irrelevant issues. These included:
- (a) Whether Plaintiffs overheard doctors at FHS talking about the possibility/necessity of performing a Caesarean section. Given Plaintiffs' limited understanding of English, this testimony is not credible. A Caesarean section was not scheduled and was not called for under the circumstances.
- (2) Whether Dr. Decker should have known that JM was macrosomic and therefore at an increased risk for shoulder dystocia. Before the delivery, Dr. Decker correctly estimated JM's weight as being less than the 4,250-gram macrosomia benchmark for a diabetic mother. Tr. III, p. 206. In addition, JM was not actually macrosomic, as he weighed 4,043 grams at birth. Tr. I, p. 142-143.
- (3) Whether JM endured fetal distress during the delivery and whether the fetal monitoring strips for a certain period of the delivery were missing. JM suffered no injury as a result of this distress and there is nothing nefarious about the missing strips.
- (4) Whether Dr. Decker should have summoned help. Dr. Decker was busy dealing with the emergency. It is not clear whether help was called, but additional personnel, including a pediatric nurse and respiratory specialists arrived in the delivery room shortly after JM was delivered. Tr. I, p. 153. There is also no evidence that additional personnel in the delivery room would have made a difference.

than two minutes after the initial turtle sign.  Unfortunately, JM suffered a brachial plexus injury during the process.

The Plaintiffs contend that Dr. Decker fell short of the required standard of care because he did not employ the appropriate maneuvers in a timely fashion.  As to the timing, there is no evidence to support Plaintiffs' contention.  As soon as the shoulder dystocia was recognized, Dr. Decker employed the maneuvers in a timely manner and delivered JM shortly thereafter.  As to whether the appropriate maneuvers were administered, Plaintiffs claim that Dr. Decker used <u>traction</u> as a maneuver and that this is not consistent with the standard of care.  Indeed, all agree that such a practice would not be appropriate.   But, Dr. Decker did not use traction as a maneuver.  Rather, he used it *after* each maneuver in an effort to complete the delivery.  This utilization of traction is consistent with the standard of care.

The remaining issue is whether Dr. Decker used <u>excessive</u> traction in the process.  Dr. Decker described the force he employed as "normal."  Tr. III, p. 183.  Morataya said Dr. Decker was pulling "strongly," as though he were "trying to pull the baby's head off."  Tr. I, p. 175-176.  There is no scientific benchmark as to the appropriate amount of force to be used when delivering a baby.  It thus boils down to the doctor's training and experience to determine how much traction to employ under the circumstances.  The circumstances here called for quick action – the emergency employment of maneuvers and traction to prevent brain damage or death.  The preponderance of the evidence does not support Plaintiffs' claim that Decker's actions to save JM fell below the standard of care, particularly under these circumstances.

## VI. Conclusion

For the reasons stated, the Clerk is directed to enter judgment for Defendant and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 11, 2012.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party